UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the matter of | |
| BAYOU GROUP, LLC, et al., | Case No. 06-22306 (ASH) |
| Debtors. | Jointly Administered |

**MEMORANDUM OPINION & ORDER**

| | |
|---|---|
| BAYOU SUPERFUND, LLC, | |
| Plaintiff, | |
| -against- | |
| D. CANALE BEVERAGES, INC., | 09 Civ. 02340 (PGG) |
| Defendant. | |

| | |
|---|---|
| BAYOU SUPERFUND, LLC, | |
| Plaintiff, | |
| -against- | 09 Civ. 02345 (PGG) |
| JOHN D. CANALE, III, | |
| Defendant. | |

| | |
|---|---|
| BAYOU SUPERFUND, LLC, | |
| Plaintiff, | |
| -against- | 09 Civ. 02347 (PGG) |
| MARY P. SMYTHE RESIDUARY TRUST, | |
| Defendant. | |

BAYOU SUPERFUND, LLC,

                          Plaintiff,

            -against-                                09 Civ. 02351 (PGG)

MARVIN E. BRUCE LIVING TRUST,

                          Defendant.

PAUL G. GARDEPHE, U.S.D.J.:

These actions arise from adversary proceedings the Bayou hedge funds ("Plaintiff" or the "Funds") brought under §§ 548(a) and 544 of the Bankruptcy Code, and §§ 273-76 of the New York Debtor and Creditor Law to recover – as fraudulent conveyances – redemption payments the Funds made to certain investors within two years of August 2005, when the Funds' fraudulent nature was disclosed.  The investors named here redeemed their Bayou investments in June 2004, before the fraud was uncovered and the Funds collapsed.[1]

These actions proceeded to trial on May 3, 2011, and a jury returned a verdict in Plaintiff's favor on May 12, 2011.  Four of the seven Bayou investors who went to trial – D. Canale Beverages, Inc., John D. Canale, III, the Mary P. Smythe Residuary Trust, and the Marvin E. Bruce Living Trust ("Defendants") – have moved pursuant to Fed. R. Civ. P. 50 for judgment as a matter of law.  The three remaining investors at trial – the Christian Brothers High

---

[1]  The factual background of these actions is discussed in detail in this Court's earlier opinion:  In re Bayou Group, LLC, 439 B.R. 284 (S.D.N.Y. 2010).  Familiarity with this opinion is presumed.

1

School Endowment, Redwood Growth Partners, and the Heritage Hedged Equity Fund, L.P. –

have not moved for judgment as a matter of law.

## **PROCEDURAL HISTORY**

These actions came before this Court as a result of Defendants' appeals from

Bankruptcy Court orders granting Plaintiff summary judgment on its fraudulent conveyance

claims and denying Defendants' cross-motions for summary judgment on their good faith

defense under 11 U.S.C. § 548(c).

In In re Bayou Group, LLC, 439 B.R. 284 (S.D.N.Y. 2010), this Court reversed

the Bankruptcy Court's orders granting Plaintiff summary judgment on its actual fraudulent

conveyance claims.  The Bankruptcy Court had found that Defendants' good faith defense failed

as a matter of law because (1) Defendants had "requested redemption after learning of a 'red

flag' which, under an 'objective' standard, should have put [them] on 'inquiry notice' of some

infirmity in Bayou or the integrity of its management"; and (2) Defendants had not diligently

investigated the "red flag" issues before redeeming their investments.  In re Bayou Group, LLC,

396 B.R. 810, 848, 852 (Bankr. S.D.N.Y. 2008).

This Court concluded that the Bankruptcy Court's test for inquiry notice

represented a significant expansion of the scope of information traditionally found sufficient to

trigger inquiry notice, and was not supported by the case law.  439 B.R. at 290, 314-15.  This

Court held that the proper test here is

> whether the alleged "red flag" information would have put a reasonably prudent
> institutional hedge fund investor on inquiry notice that Bayou was insolvent or that it had
> a fraudulent purpose in making the redemption payments to [Defendants].

Id. at 313 (emphasis omitted).

2

Once a transferee is placed on inquiry notice, it must conduct a diligent investigation of the facts that put it on inquiry notice, or demonstrate that a diligent inquiry would not have uncovered the transferor's insolvency or fraudulent purpose in making the payment.  Id. at 311, 315-17, 328.  Finding that questions of fact remained as to both the inquiry notice and diligent investigation prongs of the good faith test, this Court scheduled these actions for trial. [2]  Id. at 322-23, 325, 328

At trial, the verdict sheet asked the jury to answer the following questions:

**Question 1 -- Inquiry Notice**

1.      As to each defendant listed below, indicate – by checking YES or NO – whether that defendant has proven by a preponderance of the evidence that it was not aware – at the time of its redemption request in late June 2004 – of information that would have put a reasonably prudent hedge fund investor on notice that the Bayou hedge funds might be insolvent or that the Bayou hedge fund manager authorizing the redemption payment might do so with a fraudulent purpose?

*               *               *        *

*If you answered "YES" to Question 1 as to any defendant, do not answer Question 2 as to that defendant.  If you answered "NO" to Question 1 as to any defendant, please proceed to Question 2 as to that defendant.*

_____

[2]  As discussed in this Court's September 17, 2010 memorandum opinion and order, under 11 U.S.C. § 548(a)(1)(A), a transfer made within two years of the filing of a bankruptcy petition can be avoided as an actual (or intentional) fraudulent conveyance where the transferor made the transfer with actual intent to "'hinder, delay or defraud'" creditors.  439 B.R. at 304 (quoting 11 U.S.C. § 548(a)(1)).  Under 11 U.S.C. § 548(c), after a debtor makes out a prima facie case of actual fraudulent conveyance, a transferee may avoid rescission where it took "'for value and in good faith.'"  Id. at 308 (quoting 11 U.S.C. § 548(c)).

Where, as here, the fund at issue is a Ponzi scheme, "there is a presumption that transfers were made with the intent to hinder, delay, and defraud creditors."  Id. at 306 n.19 (citing In re Manhattan Inv. Fund Ltd., 397 B.R. 1, 7 (S.D.N.Y. 2007).  Accordingly, this case proceeded to trial on the question of whether Defendants had made out their good faith affirmative defense under 11 U.S.C. § 548(c).  Defendants had the burden of proof on all issues related to their good faith affirmative defense.  439 B.R. at 308.

**Question 2 – Diligent Investigation**

2.  As to each defendant for which you answered "NO" to Question 1:  has that defendant proven by a preponderance of the evidence that it conducted a diligent investigation of the information that placed it on inquiry notice, **or** has that defendant proven by a preponderance of the evidence that a diligent investigation would not have led to discovery of the Bayou hedge funds' insolvency or the manager's fraudulent purpose in authorizing the redemption payment?

On May 12, 2011, the jury returned a Plaintiff's verdict, answering "No" as to both questions as to all Defendants.  (Tr. 1378-80)  The Court entered judgment for Plaintiffs on May 25, 2011.  (Dkt. No. 55)

    For the reasons set forth below, Defendants' motion for judgment as a matter of law will be denied.

## BACKGROUND

    The evidence at trial established the following facts:  The Bayou hedge funds were private pooled investment funds, the first of which was established in 1996.  (PX 300 (Stipulation of Facts) ¶¶ 1-2)  Sam Israel and Daniel Marino directed and controlled the Bayou hedge funds throughout their existence, with Israel acting as Chief Executive Officer and Marino acting as Chief Financial Officer.  (Id., ¶¶ 8-9)  The Bayou hedge funds' trading activity was conducted through Bayou Securities, LLC, a broker-dealer owned by Israel.  (Id., ¶ 11)  The funds were managed by Bayou Management LLC, which was also owned by Israel.  (Id., ¶ 5)  The first Bayou hedge fund began losing money as soon as it began trading, and none of the Bayou hedge funds was ever profitable.  (Id., ¶ 15)  In order to conceal these losses, the Bayou hedge funds misrepresented their performance to existing and prospective investors.  (Id., ¶ 17)

    As losses mounted, Israel and Marino decided to fire the Funds' independent auditing firm, replacing it with Richmond-Fairfield Associates, CPA, PLLC ("Richmond-

4

Fairfield"), a fictional accounting firm created by Marino to pose as an independent auditor.  (Id.,
¶ 18)  From 1998 through 2005, Bayou distributed annual financial reports to investors that
included a "Report of Independent Certified Public Accountants" – on Richmond-Fairfield
letterhead – representing that the financial statements were prepared "fairly, in all material
respects . . . . [and] in conformity with generally accepted accounting principles."  (Id., ¶ 21)
Richmond-Fairfield's certifications in Bayou Funds' financial statements that it was an
independent certified public accounting firm, that it had audited the financial statements of the
applicable Bayou fund, that the audit had conformed to generally accepted accounting standards,
and that the Funds' financial statements were accurate, were all false.  (Id., ¶ 19)

     The Bayou hedge funds collapsed in August 2005.  The Funds notified investors
that they were voluntarily liquidating and that all investors would receive a 100 percent
redemption.  No investor received any additional payment from the Funds, however.   (Id., ¶ 28)
A receiver was subsequently appointed to manage the affairs of the Bayou hedge funds.  (Id., ¶
32)  The receiver filed the bankruptcy petitions that ultimately led to the actions before this
Court.  (Id., ¶ 34)

     Between 2001 and 2003, Defendants made investments in the Bayou hedge funds
ranging from $1 million to $4 million. (Id., ¶¶ 42-45)  Defendants all requested redemption of
their accounts in late June 2004.  (Id.)

     Defendants sought to prove that they had redeemed their investments in "good
faith," within the meaning of 11 U.S.C. § 548(c), and accordingly that their principal investments
were not subject to recovery as fraudulent conveyances.[3]  The evidence and argument at trial

---

[3]  As discussed at length in this Court's earlier opinion, "good faith" under Section 548(c) is a
term of art:

centered on what information Defendants had at the time of their redemption, and what a

reasonably prudent investor would have inferred from that information.

Defendants were all clients of Consulting Services Group ("CSG"), a registered

investment advisory firm.  (Tr. 398)  Lee Giovannetti and Kurt Voldeng, respectively CSG's

chief executive and senior consultant in charge of hedge fund investments, were Defendants'

primary advisers with respect to their Bayou fund investments.  (Tr. 395, 681)

At trial, Plaintiff argued that Defendants, through their advisors,[4] had knowledge

of certain "red flag" information that placed them on inquiry notice that the redemption

payments were being made to them with a fraudulent purpose.  This evidence included (1) a

background investigation report concerning Bayou disclosing that a former principal in Bayou

Managment, Paul Westervelt, had filed a lawsuit asserting that Bayou was engaged in activities

that could subject it to criminal and civil liability, and complaining that Israel and Marino had

---

The good faith test under Section 548(c) is generally presented as a two-step inquiry. The
first question typically posed is whether the transferee had information that put it on
inquiry notice that the transferor was insolvent or that the transfer might be made with a
fraudulent purpose. . . . Once a transferee has been put on inquiry notice of either the
transferor's possible insolvency or of the possibly fraudulent purpose of the transfer, the
transferee must satisfy a "diligent investigation" requirement.

To satisfy the "diligent investigation" requirement, the transferee must demonstrate that it
"conducted a diligent investigation of the facts that put it on inquiry notice," or that a "'diligent
inquiry would [not] have discovered the fraudulent purpose' of the transfer" or the transferor's
insolvency. 439 B.R. at 310, 312 (citing In re Manhattan Inv. Fund Ltd., 397 B.R. at 22-23, 24
and quoting In re Agric. Research & Tech. Grp., 916 F.2d 528, 536 (9th Cir. 1990)) (emphasis
omitted).  "An objective, reasonable investor standard applies to both the inquiry notice and the
diligent investigation components of the good faith test."  439 B.R. at 313 (citing Jobin v.
McKay, 84 F.3d 1330, 1336 (10th Cir. 1996)).
[4]  The Court instructed the jury, without objection, that "[w]hen deciding whether each defendant
was on inquiry notice of insolvency or fraudulent purpose, you should consider not only what
each defendant knew directly but also any information that the defendant's advisor had."  (Tr.
1359)

denied him access to the firm's financial records (Pltf. Exs. 34-35); (2) inconsistent representations from Bayou personnel regarding how the Bayou offshore funds calculated their Net Asset Values ("NAVs") (Pltf. Ex. 49); (3) communications from Matt Robinson, a Bayou Securities employee and family friend of Giovannetti, demonstrating a lack of confidence in the accuracy of Bayou's returns and concerns about Marino's trustworthiness (Pltf. Ex. 45); and (4) Marino's refusal – at a June 22, 2004 meeting – to (a) address CSG's concerns about the Westervelt lawsuit and (b) permit CSG to confirm the NAVs that Bayou was reporting.  (Tr. 542-46).

The evidence demonstrated that immediately after the June 22, 2004 meeting – and without any investigation of any sort – CSG recommended to its clients – including Defendants – that they redeem their investments in the Bayou Funds, and Defendants all submitted redemption requests in late June 2004.  (Tr. 549, 554, 556; Def. Trial Ex. 72; PX 300 (Stipulation of Facts) ¶¶ 42-45)

At trial, Defendants' principal argument was that none of the alleged "red flag" information had put them on inquiry notice.  (Tr. 1282-83, 1286, 1309-10, 1315-16)  Defendants did not assert that they had conducted a diligent investigation, but contended instead that no diligent investigation would have disclosed Bayou's insolvency or fraudulent purpose in making the redemption payments.  (Tr. 1324)

## JURY INSTRUCTIONS

The jury received the following instructions concerning "good faith" under Section 548(c) and "inquiry notice":

"Good faith" is a term of art under the bankruptcy code.  And as I told you at the beginning of the trial, it does not mean what "good faith" means in common English.

7

You should put out of your mind all prior understanding of the everyday common usage of "good faith." Such everyday usage of this term has no applicability here.

Instead, as I told you at the outset of the case, to determine whether a defendant submitted its redemption request in "good faith" under the bankruptcy code, you must consider two questions. First, you must consider whether the defendant you are considering was on inquiry notice that the Bayou funds were insolvent or that the redemption payment the defendant was seeking would be paid by the fund manager with a fraudulent purpose. You will determine whether each defendant was on inquiry notice by asking yourself whether that defendant or its investment advisor had information that would have put a reasonably prudent hedge fund investor on notice that the Bayou hedge funds might be insolvent or that a Bayou hedge fund manager might authorize the redemption payment with a fraudulent purpose. A fraudulent purpose might, for example, be avoiding or delaying disclosure of the ongoing fraud at the Bayou hedge funds.

I have made reference to whether the defendants or their investment advisors had information that would have put a reasonably prudent hedge fund investor on inquiry notice of insolvency or fraudulent purpose. I have used the term "reasonably prudent hedge fund investor" because the test you must apply is an objective one. While you may consider what the defendants' witnesses said about their subjective views at the time they submitted their redemption requests, the test you must apply is objective, what a reasonably prudent hedge fund investor would make of the information available to the defendants at the time they submitted their redemption requests.

Here, you have heard that five of the defendants – D. Canale Beverages, Inc., John D. Canale III, the Mary P. Smythe Residuary Trust, the Marvin E. Bruce Living Trust, and the Christian Brothers High School Endowment – relied on an investment advisor called Consulting Services Group, or CSG, when they invested in the Bayou funds and when they submitted their redemption requests . . . . When deciding whether each defendant was on inquiry notice of insolvency or fraudulent purpose, you should consider not only what each defendant knew directly but also any information that that defendant's advisor had.

Let me clarify what it means to be on inquiry notice.

In order to find that a defendant was on notice of insolvency or fraudulent purpose, you do not need to find that that defendant or its advisor had actual knowledge that the Bayou hedge funds were insolvent, or that the Bayou hedge fund manager authorizing the redemption payments might have a fraudulent purpose in doing so. Rather, you should find that a defendant was on inquiry notice if you find that it had information which would have led a reasonably prudent hedge fund investor to investigate the possibility that Bayou might be insolvent or that the redemption payment might be authorized by a Bayou manager with a fraudulent purpose.

In deciding the inquiry notice question, you may consider the standards, norms, practices, sophistication and experience generally possessed by institutional hedge fund investors to the extent that the evidence offered in this case has shed light on these issues.  You should also keep in mind that not all problems at a company necessarily signify insolvency or fraudulent purpose.

. . . .

As I instructed you during the trial[,] for purposes of the inquiry notice question, the relevant time period ends in late June 2004, when each defendant submitted its redemption request.  Accordingly, in determining whether the defendants were put on inquiry notice, you are to consider the information available to each defendant at the time that it submitted its redemption request.  Testimony or exhibits reflecting events that occurred after a defendant submitted its redemption request may also be considered by you on the inquiry notice question to the extent that it sheds light on that defendant's state of mind as of late June 2004, when its redemption request was made.

That concludes my instruction on the inquiry notice portion of the good faith defense.  If you determine that any defendant has proven by a preponderance of the evidence that it was not on inquiry notice of insolvency or fraudulent purpose, you must return a verdict in favor of that defendant.  If, however, you determine that any defendant has failed to prove by a preponderance of the evidence that it was not on inquiry notice of insolvency or fraudulent purpose, then you must move on to the second component of the good faith test.  I will refer to this component of the good faith test as the diligent investigation prong.

(Tr. 1357-62)

The Court gave the jury the following instructions concerning the "diligent investigation" prong of the good faith test:

The diligent investigation prong of the good faith test requires you to consider whether (1) each defendant conducted a diligent investigation of the facts that put it on notice that the Bayou hedge funds might be insolvent, or that the redemption payment might be made with a fraudulent purpose; and (2) whether a diligent investigation would have discovered the funds' insolvency or the managers' fraudulent purpose in making the redemption payment.  If you find that a defendant did not conduct a diligent investigation of the facts that put it on notice of possible insolvency or fraudulent purpose, and you further find that a diligent investigation of those facts would have led to discovery of insolvency or fraudulent purpose, you must return a verdict in plaintiff's favor and against that defendant.  But if you find that a defendant conducted a diligent investigation of the facts that put it on notice of possible insolvency or fraudulent purpose, or you find that a diligent investigation would not have led to discovery of insolvency or fraudulent purpose, then you must return a verdict in favor of that defendant.

9

"Diligent," as used here, means an investigation that is reasonable, prudent, careful, and responsive to the available information.

 It is important to keep in mind that the question you must decide as to diligent investigation is not whether a reasonably prudent hedge fund investor would conduct an investigation or simply close its account.  If you conclude that a defendant or its advisor was put on inquiry notice of possible insolvency or fraudulent purpose, the law imposes a duty on such parties to conduct a diligent investigation, or demonstrate that a diligent investigation would not have led to discovery of the insolvency or fraudulent purpose.

The defendants' actions are not to be evaluated on the basis of hindsight, or measured on the basis of whether they were successful or unsuccessful in uncovering the Bayou hedge funds' insolvency or fraud.  Instead, the diligent investigation question is to be measured by asking what a reasonably prudent hedge fund investor would have done based on the information available to the defendants and their advisors at the time the investors submitted their redemption requests.

As with the inquiry notice question, in determining whether a defendant conducted a diligent investigation, you should consider that defendant's actions under an objective standard, and consider what a reasonably prudent hedge fund investor would have done.  Accordingly, as with the inquiry notice question, you may consider the standards, norms, practices, sophistication, and experience generally possessed by reasonably prudent hedge fund investors[,] to the extent that the evidence offered in this case has shed light on that.

I instructed you earlier, in connection with the inquiry notice prong of the good faith test, that you should consider post-redemption request evidence only to the extent that it sheds light on a defendant's state of mind when it submitted its redemption request in June 2004.  That time limitation does not apply to the diligent investigation prong.  Accordingly, you may consider post-June 2004 evidence, such as public records and the actions of other investors, in determining whether the defendants conducted a diligent investigation and whether a diligen[t] investigation would have led to discovery of the Bayou hedge funds' insolvency or fraudulent purpose in making redemption payments.

As with the inquiry notice component, each defendant has the burden of proving the diligent investigation prong by a preponderance of the evidence.  Accordingly, if you reach the diligent investigation prong of the good faith test, and you find that a defendant has shown by a preponderance of the evidence that it conducted a diligent investigation, or that a diligent investigation would not have led to discovery of the Bayou hedge funds' insolvency or fraudulent purpose, you must return a verdict in favor of that defendant.  If you reach the diligent investigation prong and a defendant does not meet that burden, you must return a verdict in plaintiff's favor and against that defendant.

(Tr. 1362-65)

## DISCUSSION

In their motion for judgment as a matter of law, Defendants do not dispute that they were aware of sufficient "red flag" information to put a reasonably prudent hedge fund investor on notice that the Bayou hedge funds were insolvent or that the redemption payments might be made with a fraudulent purpose.  See Def. Reply Br. 1 n.2 ("the issue of red flags is simply irrelevant to this motion").  Defendants likewise do not contend that they conducted a "diligent investigation" after obtaining the "red flag" information.  Instead, Defendants argue that "the jury was not presented any evidence challenging . . . Defendants' evidence that they could not have uncovered the fraudulent business operation at the Bayou Hedge Funds."  (Def. Br. 7)

Although Defendants presented virtually no evidence at trial concerning what a diligent investigation by a reasonably prudent hedge fund investor would have entailed or produced,[5] they now contend that (1) even if they could have discovered that Marino was the registered agent of Bayou's purported auditing firm, this discovery would not necessarily have led to the conclusion that the Bayou hedge funds were operating as a fraud; and (2) their attempts to obtain access to Bayou prime broker records and NAV documentation were unsuccessful, and demonstrate that no amount of investigation could have uncovered the fraud.

## I.     STANDARD FOR JUDGMENT AS A MATTER OF LAW

The standard for granting judgment as a matter of law under Rule 50 is "well established":

---

[5]  Defendants' theme at trial was that they had no reason to suspect fraud.  See, e.g., Tr. 1286 ("That doesn't mean that you suspect a fraud."); Tr. 1310 ("why would the knowledge that Dan Marino was also calculating the offshore NAVs . . . create a concern of fraud? . . . . The issue was administrative. . . . It wasn't a problem because that created a suspicion of fraud.  That wasn't the issue.")

> Judgment as a matter of law may not properly be granted under
> Rule 50 unless the evidence, viewed in the light most favorable to
> the opposing party, is insufficient to permit a reasonable juror to
> find in [its] favor.  In deciding such a motion, the court must give
> deference to all credibility determinations and reasonable
> inferences of the jury, and it may not itself weigh the credibility of
> witnesses or consider the weight of the evidence. Thus, judgment
> as a matter of law should not be granted unless
>
> (1) there is such a complete absence of evidence supporting the
> verdict that the jury's findings could only have been the result of
> sheer surmise and conjecture, or
>
> (2) there is such an overwhelming amount of evidence in favor of
> the movant that reasonable and fair minded [persons] could not
> arrive at a verdict against [it].

Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 288 (2d Cir. 1998) (citations

omitted); see also Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133-34 (2d Cir. 2008) (same).

Accordingly, a party seeking judgment as a matter of law bears a "heavy burden."  Cash v.

County of Erie, 654 F.3d 324, 333 (2d Cir. 2011).

Here, there is ample evidence supporting the jury's conclusion that a diligent

investigation would have led to discovery of the fraud.  Accordingly, there is no basis for setting

aside the jury's verdict.

## II.    EVIDENCE REGARDING RICHMOND-FAIRFIELD

Plaintiff offered at trial several publicly available documents revealing the

association between Richmond-Fairfield and Daniel Marino.  For example, Richmond-Fairfield's

May 10, 2000 Articles of Organization – on file with New York's Department of State –

identified Marino as Richmond-Fairfield's organizer, its only member, and its only licensed

CPA.  (Pltf. Ex. 133)  An April 2003 amendment to Richmond-Fairfield's Articles of

Organization again identified Marino as the sole "Organizer and Member"; a July 2004

"Certificate of Change" identified Marino as Richmond-Fairfield's sole member; and a December 2004 State Department filing signed by Marino identified him as the owner of Richmond-Fairfield.  (Pltf. Exs. 134, 135, 136)

Plaintiff also introduced evidence demonstrating that at least one Bayou investor had discovered the connection between Marino and Richmond-Fairfield after only a few hours of internet research.  Matthew Osborne, the former director of research for Altegris Investments, testified that Altegris had recommended the Bayou hedge funds to its clients in early 2002.  (Tr. 1169-70)  In June 2004, after Marino had refused to provide information to Osborne concerning Bayou's operations, Osborne asked a subordinate to research the Bayou Funds' alleged auditor, Richmond-Fairfield.  (Tr. 1173-76)  In the course of about a day, Osborne and his colleague discovered that Marino was the registered agent for Richmond-Fairfield.  (Tr. 1176-77)  Osborne acknowledged that it was "not usual" for an independent auditor to be affiliated with a hedge fund.  "Several days" after discovering the connection, Altegris recommended that its clients redeem their investments in Bayou.  (Tr. 1179-80)

A rational jury could have concluded that a "diligent investigation" of the "red flags" would have rapidly produced evidence of Marino's connection to Richmond-Fairfield. Indeed, Osborne testified that he began his investigation of Richmond-Fairfield after Marino – as with Defendants – had refused to address concerns about Bayou's operations.  A "diligent investigation" of Marino's association with Richmond-Fairfield, in turn, would likely have led to discovery of the fraud at Bayou.

The discovery of Marino's association with Richmond-Fairfield signified much more than that the audits of the Bayou Funds had not been conducted by an independent auditor. The State Department records, and any investigation based on those records, would have rapidly

revealed that there was no Richmond-Fairfield.  Knowledge that Bayou's chief financial officer

had created an entirely phony accounting firm, and had distributed countless phony financial

statements and annual reports to investors, would, in turn, have suggested to a "reasonably

prudent hedge fund investor" that the Bayou Funds might be operating as a fraud, and that

redemption payments made by the Funds might be designed to avoid discovery of the fraud.  In

light of this evidence, and given that Defendants had the burden at trial of demonstrating that a

diligent investigation would not have led to discovery of the fraud at Bayou, there is little

substance to Defendants' argument that the jury's verdict is not supported by the evidence.[6]

## CONCLUSION

For the reasons stated above, Defendants' motion for judgment as a matter of law

is denied.  The Clerk of the Court is directed to terminate the motion (Dkt. No. 56) and to close

these cases.

Dated: New York, New York
       February 6, 2012

SO ORDERED.

Paul G. Gardephe
United States District Judge

---

[6]  Given that Richmond-Fairfield did not exist, Defendants' arguments (Def. Br. 6) about their inability to obtain access to Bayou's trading records and NAV documentation from either Bayou or the Bayou Funds' auditor are beside the point.  The point here is not that an auditor would have refused to provide the requested records; the point is that Marino had fabricated the existence of the auditor and had disseminated countless false communications to investors and the general public about the phony auditor and its alleged audit work.